IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| JODELLE L. KIRK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:13-cv-5032-DGK |
| | ) | |
| SCHAEFFLER GROUP USA, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING IN PART MOTION FOR SUMMARY JUDGMENT**

This case arises from Defendants' release of trichloroethylene ("TCE") into the environment near Plaintiff Jodelle Kirk's childhood home. Plaintiff alleges she was exposed to the TCE, and that it caused her to develop several serious illnesses, including autoimmune hepatitis ("AIH").

Now before the Court is Defendants' Renewed Motion for Summary Judgment (Doc. 278). After carefully reviewing the record and considering the parties' arguments, the Court holds there are genuine issues for trial and Defendants are not entitled to summary judgment except on the claim concerning whether Defendant FAG Holding, LLC is liable for the actions of FAG Bearings Corporation. However, the Court holds Defendant Schaeffler Group, USA, Inc. is judicially estopped from denying that it is the successor to FAG Bearings Corporation. Thus, Defendants' motion is GRANTED IN PART and DENIED IN PART.

**Summary Judgment Standard**

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the court of

the basis for its motion, and it must identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011). If the movant does so, then the nonmovant must respond by submitting evidence demonstrating that there is a genuine issue for trial. *Id.* The court views any factual disputes in the light most favorable to the nonmoving party. *Id.* Decisions concerning credibility determinations, how to weigh the evidence, and what inferences to draw from the evidence, are decisions reserved for the jury, not the judge. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To establish a genuine issue of fact sufficient to warrant trial, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Nor can the nonmoving party "create sham issues of fact in an effort to defeat summary judgment." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 402 (8th Cir. 1995) (citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S 557, 585 (2009).

**Undisputed material facts**

Nearly all of the material facts in this case are in dispute, with the exception of thirteen facts which the Court has ruled to be established by offensive collateral estoppel. *See* Order Partially Granting Pl.'s Second Mot. on Collateral Estoppel (Doc. 232). The Court has limited the facts presented here to those that are not in dispute and relevant to the disposition of the summary judgment motion.[1] For example, the Court has omitted all of Defendants' proposed

---

[1] The Court has included proposed facts which have not been properly controverted or are based on reasonable inferences from material facts not in dispute. The Court has also excluded proposed facts that are not properly

facts asserting TCE cannot cause AIH in humans and that TCE did not cause Plaintiff's AIH because Plaintiff has placed admissible evidence in the record indicating that TCE can cause AIH in humans, and that it is more likely than not that TCE caused Plaintiff's AIH. *See* Order Denying Mot. to Exclude Pl.'s Experts (Doc. 285) at 2-5. Thus, there is a genuine dispute of material fact on these points.

With that in mind, the Court finds the relevant material facts to be as follows.

**General background facts**

FAG Bearings Corporation, which became Defendant FAG Bearings LLC ("FAG Bearings")[2] on January 6, 2005, operated a manufacturing plant at 3900 Rangeline Road, Joplin, Missouri, until at least June 6, 2005. FAG Bearings used a TCE vapor degreasing system in its manufacturing process until 1983, using TCE as a solvent for removing grease from metal parts.

FAG Bearings released TCE into the environment in a number of different ways. It released approximately 12,000 to 25,000 gallons of TCE through waste, spills, leaks, overflowing tanks, incidental use of TCE, and dumping of "still bottoms" into the ground at FAG Bearings' facility. It could not account for approximately 30,000 gallons of TCE it purchased.

FAG Bearings also used a vapor recovery system to recover TCE. This vapor recovery system frequently and repeatedly malfunctioned, releasing large amounts of TCE into the air over a long period of time. FAG Bearings' own experts and employees have opined that these vapors then condensed and returned to the soil on its property. FAG Bearings knew that the

---

supported by admissible evidence, legal conclusions, and argument presented as fact. *See* Fed. R. Civ. P. 56(c); L.R. 56.1(a).

[2] The Court previously held that FAG Bearings Corporation became FAG Bearings on January 6, 2005. *See* Order Partially Granting Pl.'s Mot. on Collateral Estoppel (Doc. 131) at 9-10.

vapor recovery system malfunctioned and allowed TCE to escape regularly and repeatedly. The releases of TCE on the property were predictable and foreseeable.

During investigations from 1991 to 1996, TCE or TCE-related chemicals were detected in at least thirty-six different locations across the facility. FAG Bearings' employees occasionally dumped or pumped TCE directly into the ground. The highest levels of TCE contamination were found at or near these locations.

FAG Bearings released TCE from its manufacturing plant in Joplin into the soil and surrounding groundwater. The "trail," or plume, of TCE contamination runs directly from these locations to residential wells located south of FAG Bearings' property. FAG Bearings was 100% responsible for the TCE contamination on its property, and in the nearby towns of Silver Creek and Saginaw. FAG Bearings was the sole cause of the TCE contamination in the groundwater at Silver Creek. FAG Bearings refused to cooperate in investigation and remediation of the TCE contamination.

Plaintiff alleges that FAG Bearings' conduct pouring, pumping, spilling or otherwise introducing TCE into FAG Bearings' real property and allowing TCE to contaminate the groundwater was negligent or intentional.

**Facts relevant to Plaintiff's failure to warn claim**

In April, May, and December 1991, the Missouri Department of Health ("MDOH") and the United States Environmental Protection Agency ("EPA") discovered TCE contamination in certain residential wells of Saginaw and Silver Creek Villages. In August 1991, the EPA implemented a removal action and provided bottled drinking water to Silver Creek homes where TCE concentrations above the EPA's Maximum Contaminant Level ("MCL") had been detected.

Plaintiff has produced documents in this case that her family received regarding the TCE contamination in Silver Creek and Saginaw, including a variety of fact sheets, letters, notices, and other information regarding the TCE contamination and subsequent remediation efforts. In or about November 1991, Plaintiff's family received a fact sheet from the MDOH regarding the laboratory test results for TCE in water samples and potential health risks from exposure to TCE.

Between November 13 and 15, 1991, the MDOH conducted laboratory testing of the water supply at Plaintiff's home and provided the results to her family. Although the record is somewhat unclear on this point, this testing purportedly showed there was less than one microgram per liter of TCE in the sample, a health risk the MDOH described as "so small as to be virtually non-existent." (Plaintiff's experts dispute the accuracy of this testing and what the results indicate.)

Between November 1991 and March 1992, the Kirk family received several letters, information sheets, agreements, contracts, and bills from the Village of Silver Creek regarding the construction and implementation of the public water system, meetings to discuss the TCE contamination, legal representation to "pursue FAG's liability and obtain public water," and the results of well water testing. The EPA provided Plaintiff's parents with a December 1991 letter and January 1992 fact sheet regarding the extent of TCE contamination. The December 1991 letter from the EPA provided notice of a public meeting on January 6, 1992 "to answer any questions or concerns you may have about this site." The January 1992 EPA fact sheet discussed EPA measures to limit potential risks to residents and an upcoming EPA-led public meeting. Pam Stanley, a Silver Creek resident, testified that she attended meetings to discuss the TCE contamination, and that Plaintiff's parents also attended those meetings.

5

On or about February 6, 1992, Plaintiff's family received letters from the EPA sharing the results of a water sample taken from their residence. These letters stated that no TCE was detected in their water supply. (Again, Plaintiff's experts dispute the accuracy of this testing and what the results indicate.)

In a mailing postmarked March 26, 1992, Plaintiff's father received a March 23, 1992, fact sheet from the Missouri Department of Natural Resource ("MDNR") describing the history and extent of the TCE contamination in Silver Creek; various EPA, MDNR, and MDOH public meetings in 1991 and 1992 to address the contamination; and "a chronology of significant site events."

Plaintiff's family also received a September 1993 EPA fact sheet regarding trust funds available to "allow [the community] to hire an independent expert to help them interpret technical data, understand site hazards, and become more knowledgeable about the different technologies that are being used to clean up sites."

**Facts relevant to Plaintiff's damages**

Plaintiff asserts that she was exposed to TCE, and her alleged exposure caused a variety of physical ailments, including AIH. Plaintiff has never sought treatment from any psychiatrists or psychologists. The only reference to mental or emotional anguish in the record is Plaintiff reporting having "general anxiety" to some of her doctors and receiving anxiety medication. None of Plaintiff's treating physicians have diagnosed her with any mental or emotional condition such as an anxiety disorder or depression. None of Plaintiff's treating physicians attributed any of her anxiety to her purported exposure to TCE. While Plaintiff may have reported a general "fear of cancer" to some of her doctors, her medical records contain no

evidence substantiating or diagnosing this fear or connecting it to her purported exposure to TCE.

**Facts relevant to the relationship between the Defendants**

Plaintiff further alleges that Defendants Schaeffler Group USA, Inc. ("Schaeffler") and Defendant FAG Holding, LLC ("FAG Holding") are each responsible for FAG Bearings' conduct.

On January 6, 2005, FAG Holding Corporation converted into a limited liability company, Defendant FAG Holding. FAG Holding is a limited liability company organized under the laws of Delaware. FAG Holding has one member, Schaeffler, which is a Delaware corporation. Also on January 6, 2005, FAG Bearings Corporation converted into a limited liability company, FAG Bearings, LLC ("FAG Bearings"). FAG Bearings is a limited liability company organized under the laws of Delaware. Schaeffler is also the sole member of FAG Bearings.

Prior to 2005, Schaeffler had no ownership interest in FAG Bearings—or so the Court believed on January 20, 2015, when it issued its first ruling on collateral estoppel. Plaintiff has subsequently brought to the Court's attention that on November 27, 2006, Schaeffler filed suit in the United States Court of International Trade against the United States of America challenging the constitutionality of a federal antidumping statute and duty orders on antifriction bearings. In the complaint in that case, Schaeffler asserted that:

> Schaeffler is a U.S. corporation with its principal place of business at Ft. Mill, South Carolina. Together with INA-USA Corporation of Ft. Mill, South Carolina, and **FAG Bearings Corporation** of Stamford and Danbury, Connecticut, and Joplin, Missouri, **which by change of name and/or merger were absorbed into Schaeffler** (and are hereby included within the definition of "Schaeffler" for purposes of this complaint), Schaeffler has been a

> U.S. manufacturer of antifriction bearings ("AFBs"), including ball bearings, since 1969.

Compl. at 1, *Schaeffler Grp. USA, Inc. v. United States*, No. 06-0432 (Ct. Int'l Trade Nov. 27, 2006) (Doc. 2) (emphasis added).[3] The complaint also asserted that as a result of the name change/merger involving FAG Bearings Corporation, Schaeffler had standing to sue for violations of its constitutional rights stemming from the views it expressed in 1988 and 1989 opposing an antidumping petition. *Id.* at 4-6.

> The United States Court of International Trade ruled on January 17, 2012, that:

>> Plaintiff Schaeffler Group USA, Inc. ("Schaeffler"), a U.S. producer of antifriction bearings,[3] is the legal successor to two U.S. producers of antifriction bearings who participated in a 1988 investigation conducted by the ITC that culminated in the issuance of antidumping duty orders . . .

>> [3] The Court accepts Plaintiff's undisputed representation that it is the legal successor to INA Bearing Co., Inc. and FAG Bearings Corp., and will refer to these companies interchangeably as "Schaeffler."

*Schaeffler Grp. USA, Inc.*, 808 F. Supp. 2d 1358, 1360 (Ct. Int'l Trade 2012).[4]

On February 19, 2008, in *Euroatlantic Airways-Transportes Aemos S.A. v. United Technologies Corp.*, Schaeffler stated to the United States District Court for the District of Connecticut that "FAG Bearings Corp. does not exist as a separate legal entity apart from Schaeffler**.**" Schaeffler also told the court,

> As detailed by the Affidavit of Steven Crow, Esq., Schaeffler's General Counsel, which accompanies this memorandum of law, FAG Bearings Corporation converted to FAG Bearings LLC in January 2005, a wholly owned subsidiary of Schaeffler, and sold all of its assets except for some land and buildings in Joplin, Missouri to Schaeffler Group USA Inc. Currently, 'FAG

---

[3] A copy of this complaint is in the record at Doc. 291-17.

[4] A copy of this order is in the record at Doc. 291-18.

> Bearings' is an assumed name or 'd/b/a' under which Schaeffler sometimes conducts business. It has no distinct corporate existence and under Connecticut law lacks the capacity to be sued.

Mem. of Law in Supp. of Mot. for Summ. J. at 4-5, *Euroatlantic Airways-Transportes Aemos S.A. v. United Technologies Corp.*, No. 3:07-cv-0950-MRK (D. Conn. Feb. 19, 2008) (Doc. 93).[5]

## Discussion

Plaintiff's First Amended Complaint (Doc. 19) asserts three "toxic tort" claims against Defendants. These claims are for strict liability (Count I), negligence (Count II), and negligence per se (Count III). Count IV pleads punitive damages. Defendants have moved for summary judgment on all claims and, arguing in the alternative, summary judgment on individual claims.

**I.  There is a genuine dispute of material fact concerning causation.**

Defendants' first four arguments all concern causation and, if accepted by the Court, would result in the entry of summary judgment on all claims. Defendants argue: (1) Plaintiff cannot identify any admissible evidence that she was exposed to TCE; (2) Plaintiff has no admissible evidence that TCE can cause AIH in humans; (3) Plaintiff's experts failed to analyze key evidence demonstrating that TCE does not cause AIH in most or all animals; and (4) even if data from animal testing is applicable to humans; testimony from Plaintiff's experts shows she was not exposed to enough TCE to cause her AIH.

To establish causation for a toxic tort claim under Missouri law, a plaintiff must prove:

> (1) an exposure to an identified harmful substance significant enough to activate disease (2) a demonstrable relationship between the substance and biologic disease (3) diagnosis of such disease in the plaintiff (4) expert opinion that the disease found in plaintiff is consistent with exposure to the harmful substance [and] (5)

---
[5] A copy of this memorandum is in the record at Doc. 291-19.

> defendant was responsible for the etiologic agent of the disease diagnosed in plaintiff.

*Elam v. Alcolac, Inc.*, 765 S.W.2d 42, 178 (Mo. Ct. App. 1988). As discussed at length in the Court's Order Denying Motion to Exclude Plaintiff's Experts (Doc. 285), testimony provided by Plaintiff's experts Dr. Gilbert; Dr. Ernest Chiodo, M.D.; Dr. Allen Parment, M.D.; Dr. Thomas Zizic, M.D.; and Drs. Lorne Everett and James Wells is admissible and, if credited by the jury, would establish all of these elements. Accordingly, Plaintiff can establish causation, and Defendants have not established that they are entitled to summary judgment on this ground.

**II.  There is a genuine dispute of material fact concerning whether Defendants had knowledge of, or met, the applicable standard of care.**

Defendants also argue that they are entitled to summary judgment on Plaintiff's claims for negligence, strict liability, and punitive damages because she has no admissible evidence concerning the applicable standard of care or Defendants' knowledge of that standard. Defendants argue Plaintiff seeks to show their knowledge and the applicable standard of care solely through the opinions of Drs. Everett and Wells, and that these two are not qualified to render such opinions. They also contend that the testimony of their expert on this subject, Dr. B. Tod Delaney, establishes that FAG Bearings adhered to industry standards during the relevant time period.

Negligence and strict liability claims require the court to determine what standard of care the defendant owed to the plaintiff, and require the plaintiff to prove that the defendant failed to meet that standard. *See Pierce v. Platte-Clay Elec. Co-op., Inc.*, 769 S.W.2d 769, 771-72 (Mo. 1989) (discussing the applicable standard of care). While "[e]vidence of industry custom or standard is admissible proof in a negligence case," such standards "do not establish a legal standard of care." *Id*. at 772. "The duty of care is an objective standard determined by what an

ordinary careful and prudent person would have done under the same or similar circumstances."
*Id.* Assuming for the sake of argument that the only way Plaintiff could establish knowledge and breach of the applicable standard of care is through Drs. Everett's and Wells' testimony,[6] Plaintiff could still establish these elements. Again, as discussed in the Court's Order Denying Motion to Exclude Plaintiff's Experts, Drs. Everett and Wells are qualified to offer a narrow opinion that during the applicable time period it was established and known throughout the industry that a responsible company would not have poured TCE directly into the ground uphill from a community as FAG Bearings did. This testimony, if fully credited by the jury, would establish the applicable standard of care, Defendants' knowledge of that standard, and Defendants' breach of that standard. Hence, there are disputed questions of material fact here, and Defendants are not entitled to summary judgment on this ground.

### III. Whether Plaintiff received adequate warning of the alleged dangers of TCE contamination is a jury question.

Defendants also argue the Court should grant partial summary judgment on the "failure to warn" portion of Plaintiff's negligence and strict liability claims. Defendants contend the record shows that Plaintiff and her family received several warnings from the EPA, MDNR, and MDOH about the alleged dangers of TCE contamination in Silver Creek and Saginaw. Since she was warned, albeit by third parties, Defendants argue she cannot prevail on this claim.

Missouri law imposes a duty to warn of a "commonly known" danger. *Grady v. Am. Optical Corp.*, 702 S.W.2d 911, 915 (Mo. Ct. App. 1985). In order for a defendant to be relieved of the duty to warn a plaintiff, however, the plaintiff must have received an *adequate* warning. *Id.* Whether a warning is sufficient depends upon several factors, including how it was given,

---

[6] Plaintiff also argues that the evidence shows that in addition to dumping TCE into the environment, Defendants failed to investigate or remediate the contamination, and this conduct also fell below the standard of care.

the language used, and how it impresses the recipient.  *See id.* at 917.  Where it is possible for reasonable people to draw different conclusions from these facts, the question of the adequacy of the warning is for the jury to answer.  *Id.* at 915.

In the present case, while there is no dispute that Plaintiff's family received notifications from various government agencies, whether these notifications adequately warned Plaintiff is hotly disputed.  For example, one notification from the MDOH indicated that the health risk Plaintiff faced was "so small as to be virtually non-existent."  A reasonable person could find that this "warning" was insufficient; indeed, a reasonable juror might find this "warning" lulled Plaintiff's family into a false sense of safety.  Consequently, the Court holds the adequacy of any warning given here is a question for the jury to decide.

## IV.     Defendants have abandoned their argument that they are entitled to summary judgment on Plaintiff's damages claims for emotional distress and fear of cancer.

In their initial brief, Defendants assert they were entitled to summary judgment on Plaintiff's damages claims for emotional distress and fear of cancer because her mental anguish had not been medically diagnosed.  In her response, Plaintiff argues that under Missouri law, mental anguish is a proper element of damages anytime the plaintiff has suffered physical injury.

Defendants abandoned this argument in their reply brief.  Accordingly, the Court denies summary judgment on this point.

## V.     FAG Holdings is not liable for the actions of FAG Bearings Corporation, but Schaeffler is.

Finally, Schaeffler and FAG Holdings argue they are entitled to summary judgment on all claims against them because FAG Bearings Corporation was solely responsible for the leak of TCE.  They contend they can be liable for FAG Bearings Corporation's conduct only if they are its alter ego or if Plaintiff successfully pierces the corporate veil.  They observe Plaintiff failed to

12
Case 3:13-cv-05032-DGK   Document 333   Filed 01/07/16   Page 12 of 15

plead piercing the corporate veil as a separate cause of action, and that Plaintiff cannot show that either company is an alter ego.

In response, Plaintiff contends that Schaeffler is judicially estopped from denying that it merged with FAG Bearings Corporation and is responsible for its liabilities. Plaintiff argues Schaeffler has taken the position in other litigation that its purchase of FAG Bearings Corporation was a merger of the two companies, making Schaeffler responsible for its liabilities. Plaintiff does not, however, put forward any explanation for how FAG Holdings is possibly liable here.

The Court holds as follows. With respect to FAG Holdings, Plaintiff concedes by her silence that it is not liable for her injuries. Accordingly, FAG Holdings is entitled to summary judgment on all claims against it.

Turning to Schaeffler, the Court notes Plaintiff is not attempting to pierce the corporate veil or show alter ego liability. Rather, Plaintiff's position is that Schaeffler is judicially estopped from denying that it previously merged with FAG Bearings Corporation and inherited its liability in the merger. Hence, Plaintiff's failure to plead piercing the corporate veil or its inability to show alter ego liability is irrelevant if judicial estoppel applies. And the Court finds it does.

The doctrine of judicial estoppel prohibits a party which advocates for and establishes a position in one judicial proceeding from subsequently assuming a contrary position in another judicial proceeding. *Stallings v. Hussman Corp.*, 447 F.3d 1041, 1047 (8th Cir. 2006). It protects the integrity of the judicial process by preventing a party "from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (internal quotation omitted). As the Supreme Court has observed, "[t]he

circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle." *Id.* at 748. It is "an equitable doctrine invoked by a court at its discretion." *Id.* at 750.

The Supreme Court has identified three factors which a court should review in determining whether to apply the doctrine. *Stallings*, 447 F.3d at 1047. First, the party's "later position must be clearly inconsistent with its earlier position." *New Hampshire*, 532 U.S. at 750. Second, the court considers "whether the party has succeeded in persuading a court to accept" its earlier position, "so that judicial acceptance of an inconsistent position in a later proceeding would create the perception" that the previous court had been misled. *Id.* at 750-51. Third, the court considers "whether the party seeking to assert an inconsistent position would derive an unfair advantage" if not estopped. *Id.* at 751.

In the present case, all three factors are satisfied. First, Schaeffler's position that it is the parent company, not the successor, of FAG Bearings Corporation, is clearly inconsistent with its representation to the United States Court of International Trade ("CIT") that "FAG Bearings Corporation of . . . Joplin, Missouri" was "absorbed into Schaeffler" "by change of name and/or merger."[7] Schaeffler denies this, claiming it is totally separate from FAG Bearings Corporation. These are inconsistent positions.

Second, Schaeffler succeeded in persuading the CIT to accept its position. The CIT wrote it "accepts Plaintiff's undisputed representation that it is the legal successor to . . . FAG Bearings Corp., and will refer to these companies interchangeably as 'Schaeffler.'" Indeed, it is black letter law that a parent corporation lacks standing to sue for injuries suffered by a

---

[7] Because this is sufficient to establish the first factor, the Court need not consider whether Schaeffler's position is inconsistent with its February 19, 2008, statements to a federal district court that "FAG Bearings Corp. does not exist as a separate legal entity apart from Schaeffler," and "'FAG Bearings' is an assumed name or 'd/b/a' under which Schaeffler sometimes conducts business. It has no distinct corporate existence [from Schaeffler]."

14

subsidiary, even a wholly-owned subsidiary. *See EMI Ltd. v. Bennett*, 738 F.2d 994, 997 (9th Cir. 1984); *Construdodo, S.A. De C.V. v. Conficasa Holdings*, Inc., No. H-12-3026, 2014 WL 427114, at *4-5 (S.D. Tex. Jan. 31, 2014) (collecting cases). If, as Schaeffler now claims, it were the merely the parent corporation of FAG Bearings Corporation, then the CIT would have dismissed Schaeffler's lawsuit for lack of standing.

Third, Schaeffler would derive an unfair advantage if not estopped, because it would avoid any liability that it would otherwise have to Plaintiff. This would result in a miscarriage of justice.

Accordingly, the Court holds Schaeffler is judicially estopped from denying that it is the successor to FAG Bearings Corporation. It is liable for any liabilities FAG Bearings Corporation may have in this case.

## Conclusion

The Court holds there are genuine issues for trial and no Defendants are entitled to summary judgment except Defendant FAG Holding, LLC. The Court also holds Schaeffler is judicially estopped from denying that it is the successor to FAG Bearings Corporation. Thus, Defendants' motion (Doc. 278) is GRANTED IN PART and DENIED IN PART.

**IT IS SO ORDERED.**

Date:  January 7, 2016  /s/ Greg Kays
GREG KAYS, CHIEF JUDGE
UNITED STATES DISTRICT COURT